UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AKBAR HUSSAINI, M.D. | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 1:26-cv-1648 |
| | § | |
| ASCENSION SETON, SETON FAMILY | § | |
| OF DOCTORS,  SETON MEDICAL | § | |
| GROUP, ASCENSION MEDICAL | § | |
| GROUP LLC, ASCENSION MEDICAL, | § | |
| LLC, ASCENSION HEALTH | § | |
| ALLIANCE d/b/a ASCENSION, and | § | |
| ASCENSION TEXAS | § | |
|     Defendants. | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Akbar Hussaini, M.D. brings this action against defendants Ascension Seton, Seton Family of Doctors, Ascension Medical Group LLC, Seton Medical Group, Inc., Ascension Medical, LLC, Ascension Health Alliance d/b/a Ascension and Ascension Texas (together, "Defendants" or "Ascension") and shows the Court and Jury as follows:

## INTRODUCTION

1.      This is an employment discrimination and retaliation case. Ascension hired Dr. Akbar Hussaini as an orthopedic surgeon in 2008 at its hospitals in the central Texas area. Throughout his employment over more than 15 years, Ascension and his patients recognized Dr Hussaini as an outstanding surgeon and medical care provider. In May 2024, Dr. Hussaini raised serious concerns about operating practices to protect his patient's safety and care at Ascension's Highland Lakes Hospital in Burnet, Texas. He also raised serious concerns that he was being

1

singled out and treated differently and worse because of his race/color/national origin and religion. Although a longtime American citizen, Dr. Hussaini was born in Pakistan and is Muslim.

2.      Less than a month after Dr. Hussaini raised these concerns, Ascension terminated his employment. Ascension claimed it fired Dr. Hussaini because he allegedly treated certain OR staff in Burnet in a hostile or inappropriate manner. However, Ascension's claimed reason for the termination was false and pretextual. Additionally, in spite of his more than 15 years of employment, Ascension gave Dr. Hussaini no notice of the false claims against him or an opportunity to respond before it summarily terminated his employment. Additionally, Ascension did not terminate other surgeons who had similar or far more serious issues working with staff, and who were Caucasian and not Muslim. Ascension also provided false and/or misleading information to the Equal Employment Opportunity Commission ("EEOC), a federal agency investigating the termination. Ascension illegally terminated Dr. Hussaini's employment in retaliation for opposing discrimination, and because of his race/color/national origin and religion.

3.      Dr. Hussaini brings this suit because Ascension's illegal actions have caused profound damage to his career, as well as great economic and personal damage. He also brings this suit to help protect other employees from illegal discrimination and retaliation.

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over this suit pursuant to 28 U.S.C. §1331 and §1343(b) because this action involves claims brought under Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Western District of Texas, Austin Division.

## JURY DEMAND

6.      Plaintiff requests a jury trial.

## PARTIES

7.      Plaintiff Akbar Hussaini, MD is an individual who at all relevant times was an employee of Defendants.

8.      Defendant **ASCENSION SETON** is a Texas business entity whose mailing address is 1345 Philomena St Ste 305, Austin, TX 78723-3643 and whose registered agent is Corporation Service Company D/B/A CSC Lawyers Incorporated, 211 E. 7th St., Austin, TX 78701. Ascension Seton is a network of hospitals within Ascension Health that is based in Austin, Texas. Ascension Seton employs over 10,000 individuals and operates several large medical centers in the Central Texas area.

9.      Defendant **SETON FAMILY OF DOCTORS** is a Texas business entity whose mailing address is 1345 Philomena St Ste 305, Austin, TX 78723-3643 and whose registered agent is Corporation Service Company D/B/A CSC Lawyers Incorporated, 211 E. 7th St., Austin, TX 78701.

10.     Defendant **SETON MEDICAL GROUP, INC.** is a Texas business entity whose mailing address is 1345 Philomena St Ste 305, Austin, TX 78723-3643 and whose registered agent is Corporation Service Company D/B/A CSC Lawyers Incorporated, 211 E. 7th St., Austin, TX 78701.

11.      Defendant **ASCENSION MEDICAL GROUP, LLC** is a business entity formed in Missouri whose mailing address is PO Box 45998, c/o Tax Dept, Saint Louis, Mo 63145 – 5998 and doing business in Texas. Ascension Medical Group does not have a registered agent in Texas.

12.     Defendant **ASCENSION MEDICAL, LLC** is a Texas business entity whose

address is 18518 Hardy Oak Blvd, San Antonio, TX 78258 and whose registered agent is Patricia N Jackson, 18518 Hardy Oak Blvd, Ste 300, San Antonio, TX 78258.

13.    Defendant **ASCENSION HEALTH ALLIANCE d/b/a ASCENSION** is a Missouri business entity doing business in Texas that may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620 Austin, TX 78701.

14.    Defendant **ASCENSION TEXAS** is a Texas business entity whose mailing address is 211 E. 7th St., Suite 620, Austin, TX 78701 and whose registered agent is Corporation Service Company D/B/A CSC Lawyers Incorporated, 211 E. 7th St., Austin, TX 78701.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

15.    Plaintiff filed Charges of Discrimination within 180 days and 300 days of Defendants' illegal termination of his employment.  The Charges were dual filed with the U.S. EEOC and the Texas Workforce Commission, Civil Rights Division ("TWC").  This suit is filed within 90 days of Plaintiff's receipt of a notice or right to sue from the EEOC and within two years of the date Plaintiff's Charges of Discrimination were filed.

## FACTS

### Ascension Defendants Operate As An Integrated Enterprise/Joint Employer

16.    Ascension is one of the largest hospital systems in the United States. It operates across 16 states and the District of Columbia. Ascension's network encompasses approximately 95 wholly owned or consolidated hospitals and has ownership interests in 26 additional hospitals. Ascension also operates 30 senior living facilities. It earned over $25.6 billion in net patient revenue in Fiscal Year 2023.

17.    The Ascension Defendants acted as joint employers, an integrated enterprise, and/or otherwise acted in a manner to disregard corporate formalities or that make Defendants

4

jointly and/or severally liable with regard to Dr. Hussaini. The Defendants operate as an interrelated group of companies/organizations that acted together and operated under joint employment policies, practices and leadership with regard to Dr. Hussaini's employment and termination of employment.

18. For example, Ascension's W-2s for Dr. Hussaini were issued under various names including "Ascension Health Ministry Agent For Seton Family Of" [sic] in 2024, "Ascension Health Ministry Services Agent For Seton Healthcare" in 2021-23.

19. Paystubs for Dr. Hussaini in 2024 list his employer as "Seton Family of Hospitals."

20. As discussed below, officers from "Ascension Medical Group" ("AMG") terminated Dr. Hussaini's employment and told him that "we [AMG] hold your employment agreement." Ascension publicly lists the employers and entities associated with those officers as "Ascension Medical Group Texas" (Clay Carsner) and "Ascension Texas" (Samson Jesudass), as well as other entities. AMG also provided documents to Dr. Hussaini setting his compensation, which apparently was determined by AMG.

21. The termination letter that Defendants provided to Dr. Hussaini was on AMG letterhead but signed by "Seton Family of Doctors."

22. "Seton Medical Group," "Seton Healthcare" and "Seton Medical Group, Inc." were signatories to Dr. Hussaini's certain written employment contracts from 2010 and 2014.

23. Defendants' Position Statement provided to the EEOC stated it was being provided on behalf of "Seton Family of Doctors f/k/a Seton Family of Physicians" and that "Seton is an affiliate of Ascension Health" which put forth employment policies cited in the Position Statement. Defendants' Position Statement also referred to employment policies and practices of "Ascension nationally" in connection with Dr. Hussaini's termination. According to the Position Statement,

Ascension (nationally) was responsible for "Value Lines" and "Event Reporting System" complaint systems and a national employee campaign that were significantly involved in the termination of Dr. Hussaini's employment. Defendants' Position Statement further stated that the "Board for Ascension Seton Family of Doctors" made the decision to terminate Dr. Hussaini's employment.

24.    The Ascension Defendants shared common employment policies used in the termination of Dr. Hussaini.

25.    Ascension's national Value Lines purportedly investigated Dr. Hussaini's complaint of discrimination which was a significant cause of his termination.

26.    "Ascension Seton" and the "Ascension Seton Highland Lakes Executive Committee" which included members of AMG heard and made "Peer Review" determinations regarding complaints against Dr. Hussaini that were involved in and led to his termination and that were cited as part of Defendants' EEOC position statement and defense.

27.    On information and belief, additional discovery will establish further evidence supporting the integrated enterprise and/or joint employer relationship among Defendants or other responsible entities. Plaintiff's counsel will work with counsel for Defendants to identify the entities responsible in this action and as appropriate, dismiss those entities that do not have responsibility or liability.

**Ascension Hired Dr. Hussaini And For More Than 15 Years
Recognized Him As An Outstanding Surgeon, Health Care Provider and Leader.**

28.    Ascension Seton recruited Dr. Hussaini to join Ascension as an orthopedic surgeon in August 2008.

29.    Ascension was aware of and hired Dr. Hussaini because of his excellent credentials.

30.    After completing his undergraduate studies at Binghamton University (a highly

ranked public university in New York), Dr. Hussaini earned a Master of Science with Thesis degree in Neuroscience from the University of North Texas.  He then earned his Doctor of Medicine (M.D.) degree from the University of Texas Medical Branch (UTMB) in Galveston. He then completed a residency in Orthopedic Surgery at the University of Arkansas for Medical Sciences, College of Medicine.  After his residency, Johns Hopkins University School of Medicine selected Dr. Hussaini for a Fellowship in Arthritis Surgery. At Johns Hopkins, Dr. Hussaini worked and studied under one of the foremost hip and knee specialists in the world. Dr. Hussaini also served as a faculty instructor for Johns Hopkins' Orthopedic Surgery residents and incoming Arthroplasty fellows. Dr. Hussaini is Board Certified in Orthopedic Surgery by the American Board of Orthopedic Surgery and a fellow in the American Academy of Orthopedic Surgeons.

31.     Ascension tasked Dr. Hussaini with establishing and leading orthopedic services at its Ascension Seton Highland Lakes Hospital in Burnet, ("Highland Lakes") and two other rural hospitals in Central Texas: Ascension Seton Bastrop Hospital ("Bastrop") and Ascension Seton Smithville Hospital ("Smithville").

32.     Ascension was able to expand and provide needed orthopedic care to underserved rural communities because of Dr. Hussaini's work creating the Orthopedic Surgery programs at Highland Lakes, Bastrop, and Smithville.

33.     Throughout his employment, Ascension recognized Dr. Hussaini as an outstanding orthopedic surgeon and medical care provider.

34.     During his nearly 16-year career at Ascension, Dr. Hussaini performed thousands of orthopedic surgeries for his patients. At one point, his practice cared for over 100 outpatients per week and he completed approximately 30 surgeries per month, placing Dr. Hussaini's productivity among the highest of all orthopedic surgeons nationally.

35.     Ascension and its patients recognized Dr. Hussaini's excellent skills as an orthopedic surgeon, including in the difficult and much needed areas of knee and hip replacement surgery. Dr. Hussaini brought cutting-edge robotic arthroplasty to Highland Lakes, and advanced surgical techniques that allowed for enhanced accuracy and precision to help improve outcomes in hip, knee and shoulder replacements.

36.     Ascension patients of Dr. Hussaini regularly praised, complimented and thanked him for his surgical work and patient care. Ascension received strong, positive feedback about Dr. Hussaini through formal patient surveys, thank you notes, comments and personal testimonials to staff and to Dr. Hussaini himself about how his medical care and surgical outcomes had improved their lives.

37.     The national Ascension network recognized Dr. Hussaini multiple times for its prestigious zero infections award in his hip and knee replacement operations.

38.     Ascension appointed Dr. Hussaini as Chief of Staff and Vice Chief of Staff at Highland Lakes, and Medical Director of Surgery at its Bastrop and Smithville hospitals. In these roles, he coordinated with multidisciplinary teams of medical staff, physicians, administrators, vendors, and executives to build rural orthopedic surgery programs, provide excellent patient care and improve efficiency.

39.     Ascension relied on Dr. Hussani to help train clinicians and hospital staff—nurses, Physician Assistants ("PAs"), Nurse Practitioners ("NPs"), and a variety of technicians at all of the hospitals where he worked. As Medical Director of Surgery at Bastrop and Smithville from 2020 to 2024, he worked hard to personally train staff in multiple departments, coordinated all aspects of internal surgical services, and cultivated partnerships with external organizations to

8

expand services while saving costs. Ascension staff repeatedly rated Dr. Hussaini highly as a coworker.

40. Ascension recognized Dr. Hussaini with numerous other honors and leadership positions, such as naming him to network committee positions overseeing multiple hospitals and Medical Staff Peer Review Coordinator at Highland Lakes.

41. Ascension gave Dr. Hussaini multiple raises and bonuses over the course of his employment in recognition of his excellent quality work as a surgeon and providing the highest level of health care to his patients in rural communities.

**Ascension Treats Dr. Hussaini Differently**
**Because Of His Race, Religion And National Origin**

42. During his more than 15 years working for Ascension, Ascension employees on multiple occasions treated Dr. Hussaini differently and worse because of his race, color and national origin.

43. Dr. Hussaini was born in Pakistan to Muslim parents. In 1981, when he was ten years old, his family immigrated to the United States. Dr. Hussaini became a U.S. naturalized citizen when he was in high school and he is a proud American. Nonetheless, at times he has been viewed and treated differently by Ascension because of his Pakistani name and family origin, brown skin and Muslim religion.

44. Dr. Hussaini tried not to focus on the sometimes different, negative treatment he would encounter at Ascension because of his racial, ethnic and religious background. Dr. Hussaini was passionate about his job and cared about the patients he treated. However, some occasions stand out.

45. For example, in his early years at Highland Lakes, Ascension called him into a meeting to appear in front of the Highland Lakes CEO, its Chief of Staff, and OR staff members.

9

Ascension gave him no advanced notice about the meeting or what would be discussed. At the meeting, Ascension accused Dr. Hussaini of "terroristic" behavior based on complaints by certain OR staff members. Dr. Hussaini was forced to defend himself on the spot in front of the group. Dr. Hussaini was shocked and blindsided. Upon further questioning, the "terrorist" behavior allegation was proven to be false and was made because Dr. Hussaini was simply expecting staff to perform their jobs. Ascension and its staff never accused white, non-Muslim doctors of "terrorist" behavior who behaved similarly or more questionably on numerous occasions.

46.     On another occasion on May 17, 2019, Dr. Hussaini was at Ascension Seton Medical Center in Austin where another orthopedic surgeon was talking outside the OR to a medical product representative ("product rep"). The other orthopedic surgeon and the product rep were speaking openly and their comments could be clearly heard by anyone in the area, including Dr. Hussaini who was also present. The other surgeon warned the product rep, whose daughter was going to Europe, about how dangerous "Muslims and immigrants" were in Europe. The other surgeon described how many neighborhoods, regions, and countries in Europe were "lost" due to Muslims and immigrants, and said words to the effect of, "When I was in London, there were places that had mosques. Can you believe that? Lost. You can't go into those neighborhoods."

47.     The other orthopedic surgeon's anti-Muslim comments, made openly in the Ascension workplace, were based on broad, false, and harmful religious and racial stereotypes and were hurtful and offensive for Dr. Hussaini. After hearing the comments, Dr. Hussaini approached the surgeon and product rep and politely said "Hi, I'm Akbar Hussaini." The product rep, who knew Dr. Hussaini, then somewhat embarrassedly said, "This is Dr. Hussaini. He's an orthopedic surgeon in Burnet." Without saying anything, the other surgeon then reached out and touched the ID badge that Dr. Hussaini wore on his chest and looked at it, as if he was verifying Dr. Hussaini's

10

credentials. The other surgeon asked, "I'm sorry who?" and Dr. Hussaini replied, "Akbar, and you are?" The other surgeon then gave his name and did not engage in any conversation. Dr. Hussaini then went to the operating room to attend to his patient.

48.    Following the incident, Dr. Hussaini emailed Andy Davis, who at the time was Ascension Texas's Chief Operating Officer ("COO"), and Ascension Senior Director David Martin about what he had experienced. XXXX JesudassThe Ascension leaders never followed up with Dr. Hussaini to let him know what, if any, action Ascension took in response to the anti-Muslim comments being spread in the workplace.

49.    Other Ascension employees at the Highland Lakes hospital in Burnett also made inappropriate comments about Dr. Hussaini's racial and religious background.

50.    On numerous occasions, some Ascension Highland Lakes OR staff would comment on and criticize Dr. Hussaini relating to his race and religion. For example, in the Muslim religion there is a month-long holy period of prayer and reflection known as Ramadan. During Ramadan, people of the Muslim faith like Dr. Hussaini traditionally fast during the daytime and eat and drink only after sunset.

51.    Annually during and around Ramadan, including in March of 2024 shortly before Ascension terminated Dr. Hussaini's employment, some Ascension Highland Lakes OR staff would talk about Dr. Hussaini's daytime fasting, saying to him and others comments to the effect of "Watch out, Dr. Hussaini is hangry" or that Dr. Hussaini is "difficult to work with" during Ramadan.  The OR staff members comments were false and were made because of Dr. Hussaini's religion and background. While OR staff members made such comments, no one in Dr. Hussaini's clinic office where he spent the majority of his time made these kinds of comments based on his religion and background.

11

52.    Additionally, in March and April, 2024 (shortly before Ascension terminated Dr. Hussaini's employment), an Ascension physical therapist at Highland Lakes was reported to have made multiple derogatory and offensive comments to patients regarding Dr. Hussaini's racial and religious background, including saying words to the effect that "Dr. Hussaini does not like women due to his cultural background." Of course this claim was false and based on prejudicial bias and racial and religious stereotypes. One of Dr. Hussaini's patients (who was female) reported that she discontinued her physical therapy and said she would never go to physical therapy at Ascension Highland Lakes because of these offensive comments.

53.    The patient told an Ascension RN staff member that they reported these comments by the physical therapist to Ascension but apparently Ascension never responded or took action. The Ascension RN also later reported these comments to Ascension management and filed a formal complaint at the behest of that patient, but Ascension did not respond.

**Ascension Employees Complain When Dr. Hussaini Raises
Serious Concerns About Patient Care At Highlands Lakes Hospital In Burnet.**

54.    On or about April 22, 2024, the Ascension Highland Lakes OR staff assigned a Certified Surgical Technologist ("CST") to assist Dr. Hussaini on a more complicated hip replacement surgery on a patient. The CST (referred to as "CST 1") struggled to handle his surgical duties during the surgery, potentially putting the patient at risk and making the surgery more difficult for Dr. Hussaini. CST 1's actions also caused the surgery to take more time and because the patient was on a spinal anesthesia, time was limited. While the surgery took place, the lead CST at Highland Lakes (referred to as "CST 2") and another more experienced Orthopedic CST were outside the OR and were available to perform or assist in the case, however, neither supported CST 1 in the surgery.

12

55.    After the surgery, the lead CST 2 and Dr. Hussaini spoke about the struggles of CST 1 in the recent hip replacement surgery. CST 2 told Dr. Hussaini that CST 1 had not been in a hip replacement surgery for about five months. CST 2 told Dr. Hussaini words to the effect that he had assigned CST 1 to the complex hip surgery (instead of others who were more qualified) because CST 1 had an attitude issue and that his work ethic was poor. The lead CST 2 told Dr. Hussaini words to the effect that CST 1 had been assigned the surgery to "teach him a lesson" or punish him.

56.    Dr. Hussaini was concerned and said that assigning an underperforming CST to one of the most complex surgeries that the hospital performs was not an appropriate way to discipline an employee and was inappropriate professional behavior. Dr. Hussaini explained to CST 2 that assigning a CST who was not familiar with the surgical steps and without assistance from other available and more experienced CSTs could potentially harm patients and impact surgical outcomes. It also made the surgery longer and more stressful for everyone in the OR.

57.    CST 2 and Dr. Hussaini also discussed ongoing surgical scheduling issues at Highland Lakes. The Highland Lakes OR Director, Moira Lemons, was scheduling patients for short, minor procedures in such a way that they were delayed because of longer surgical cases. This caused patients to unnecessarily have to wait for hours to have minor things done. The conversation between CST 2 and Dr. Hussaini dealt with serious issues and was handled in a professional manner.

58.    On or about April 25, 2024, Ascension's Rural Program Director, Denise Watson, met with Dr. Hussaini and he raised his concerns about the situation with her. Immediately afterwards, Director Watson texted Ascension's Chief Medical Officer ("CMO") at Highland Lakes, Derrick Walker, D.O., about assigning the struggling CST 1 to the hip replacement surgery

and other ongoing concerns about OR practices that Dr. Hussaini had previously raised. For example, in or around November 2023, Vice President of Surgical Services for Ascension Texas, Charles Kaczmarek, came to Highlands Lakes OR and spent a day there working to address problems in the OR. At that time, Kaczmarek thanked Dr. Hussaini for his service, patience, and exemplary performance despite the challenges. Unfortunately, the issues that had been previously identified continued to be problems seriously affecting patient care.

59.     On or about April 26, 2024, CMO Walker spoke with Dr. Hussaini about his concerns about patient care and safety at Highland Lakes OR. CMO Walker agreed that the issues were concerning and said he would elevate the issues again to VP Kaczmarek.

60.     On the morning of April 29, 2024, Dr. Hussaini asked to meet with Highland Lakes Chief Operating Officer ("COO"), Karen Littler, CST 2 and OR Director Lemons. The three discussed the situation a few days before when CST 1 was assigned to the hip replacement surgery that he was not ready for, essentially as punishment or a disciplinary action. All three agreed that it compromised patient care and was unprofessional and inappropriate not to have discussed the situation with Dr. Hussaini before assigning CST 1 to the complex surgery. Dr. Hussaini explained that he would be happy to train CST 1 and any staff member, as he had done for 15 years, but that they should not surprise him by assigning someone who is not fully capable for a surgery and risk patient care.  Dr. Hussaini also explained that other more qualified CSTs were on site and available, but were not present during that surgery to assist CST 1 and ensure patient safety and outcomes. Dr. Hussaini told them that he would specifically work with CST 1 to improve his surgical skills on future surgeries. The conversation lasted for approximately 10 minutes and was handled in a professional manner.

61.    Approximately two weeks later, on May 15, 2024, Ascension Highland Lakes CMO Walker sent a casual, friendly text to Dr. Hussaini talking about several things and also asking Dr. Hussaini to "[l]et me know when you have some time to chat:"

May 15, 2024 at 10:13 AM

Good morning. I know you have been very busy. Missed seeing you last week when we were at ASHL. Hope all went well getting your daughter moved back.

Now crazy for everyone with the cyberattack awaiting resolution. Hang in there.

Let me know when you have some time to chat.

Thanks

62.    The following day, on May 16, 2024, CMO Walker and Dr. Hussaini spoke on the phone. CMO Walker began the call by asking how Dr. Hussaini's recent vacation had been. He then told Dr. Hussaini that OR staff had recently submitted multiple complaints against him through Ascension's "Values Line" complaint reporting system. Without providing specifics, CMO Walker told Dr. Hussaini that the complaints were that he was "nitpicky" and that he had questioned lead CST 2 about assigning CST 1 for the complex surgery, when scheduling was not CST 2's job responsibility.

63.    CMO Walker told Dr. Hussaini words to the effect that he did not consider the complaints to be a "big deal," told him, "don't worry," and that he would make sure the complaints would not be elevated to "Peer Review." Peer Review is process used by Ascension when there is serious concern about a doctor violating professional standards.

15

64.     Dr. Hussaini shared with Dr. Walker that he was shocked that the complaints were made and that Dr. Walker even raised "Peer Review" as a possibility. A surgeon being "nitpicky" about the care and safety of his patients was not inappropriate and did not violate professional standards. In fact, a surgeon is *supposed* to be conscientious, pay attention to details, and raise concerns about practices that put patient safety and health at risk, particularly a surgeon leading a complex operation.

## Ascension Reacts Negatively And Dismissively When Dr. Hussaini Opposes Discrimination.

65.     In the call with CMO Walker, Walker reassured Dr. Hussaini with words to the effect that the complaints "were not going anywhere." Dr. Hussaini responded saying that was fine, but that he still felt like he was being singled out for things that were not valid. Because of past experiences with OR staff, including specifically with OR Director Lemons who regularly seemed to scrutinize and single him out, Dr. Hussaini told CMO Walker that he believed he was being treated differently and singled out because of his race/skin color. Dr. Hussaini asked Walker whether there had ever been any complaints or scrutiny of other surgeons at Highland Lakes.

66.     Dr. Hussaini told CMO Walker that another Ascension surgeon at Highland Lakes, Dr. Griffith Thomas, who is white (and not Muslim), was notorious in the OR for being difficult to work with. Dr. Hussaini explained that this surgeon had been known to repeatedly throw objects, curse and yell at staff, made staff cry, and had instigated verbal fights with two colleagues who left Highland Lakes after enduring the abusive behavior.

67.     Dr. Hussaini also told CMO Walker that a different physician, who also is white, sexually harassed and fondled a non-white nurse in his practice, who reported the situation to management and Human Resources.

16

68.     Dr. Hussaini told CMO Walker that to his knowledge, Ascension had never taken action against either of these physicians. Dr. Hussaini also told Walker words to the effect that to his knowledge, the Highlands Lakes OR staff had never reported another surgeon's behavior to management and Ascension had never investigated or disciplined any other surgeon at Highland Lakes in over 15 years.

69.     Dr. Hussaini told CMO Walker that he believed he was being singled out for unfounded complaints and that it felt discriminatory based on his race. CMO Walker seemed flustered, uncomfortable, defensive and was dismissive of Dr. Hussaini's concerns of discrimination, telling him words to the effect that these events happened before he joined Ascension and he was not aware of any discrimination during his tenure. CMO Walker did not ask Dr. Hussaini any questions about his concerns of discrimination, such as details why he felt he was being discriminated against, about the behavior and different treatment of other surgeons, possible witnesses that might corroborate Dr. Hussaini's concerns of discrimination, other additional evidence, or the full story of what Dr. Hussaini had experienced.

70.     At no point in the phone call did CMO Walker tell Dr. Hussaini that he was acting inappropriately in any manner and instead, CMO Walker minimized the complaints that had been made against Dr. Hussaini.

71.     Disappointed in CMO Walker's response in the phone call to his concerns of discrimination, Dr. Hussaini decided to formally raise his concerns through an additional channel, Ascension's Values Line complaint reporting system.

72.     On the same evening of May 16, 2024, after the call with CMO Walker, Dr. Hussaini called Ascension's Values Line and spoke with an intake employee for 18 minutes.

17

73.     During the intake conversation with the Ascension complaint employee, Dr. Hussaini objected to the disparate treatment that he had experienced compared to his counterparts who were Caucasian and/or not South Asian, from another country and/or Muslim like Dr. Hussaini.

74.     The Ascension Value Lines employee asked Dr. Hussaini if there was one person who was responsible for the discrimination. Dr. Hussaini responded that there isn't necessarily one person, but that he believed OR Director Lemons discriminates in terms of who she reprimands or encourages write-ups against. He stated that OR Director Lemons blames and complains about him, while at the same time, ignoring the far more problematic behavior of other surgeons, like Dr. Thomas. Dr. Hussaini stated that his purpose was not to expose problems of Dr. Thomas, but that he wanted to be treated with the same courtesy and respect as other employees.

75.     Dr. Hussaini also told the Ascension Value Line employee that while he believed that OR Director Lemons was likely the source of the discriminatory treatment, the behavior and attitude towards him had spread to other OR staff members.

76.     The Ascension Value Lines employee asked if Dr. Hussaini had raised this concern to his superior. Dr. Hussaini responded that he had reported it to CMO Dr. Walker.

77.     Dr. Hussaini requested that the report not be disclosed to OR Director Lemons, but said that he did not want to remain anonymous so that the persons investigating the matter would know whom to contact. Dr. Hussaini confirmed that he would like to be contacted by email or phone to further discuss this matter and he provided his contact information.

78.     After taking Dr. Hussaini's complaint, the Ascension Values Line employee told Dr. Hussaini that someone from Ascension would contact him for a follow-up.

18

79. Despite telling Dr. Hussaini that the discrimination complaint would be investigated and that Ascension would contact him about the matter, Ascension never contacted Dr. Hussaini about the Values Lines discrimination complaints to ask him for more information, evidence, or to discuss the findings of their "investigation."

80. The following morning, on Friday, May 17, 2024, Dr. Hussaini texted and spoke with Ascension Rural Program Director Watson and asked for her help to set up an in-person meeting with OR staff and hospital leadership to discuss his concerns. Director Watson suggested meeting with leadership first and then later with the OR staff. Director Watson then arranged a meeting with Highland Lakes leadership at Dr. Hussaini's request for Wednesday, May 22, 2024.

81. On Friday evening, May 17, 2024, CMO Walker texted Dr. Hussaini thanking him for his time in the phone call the previous evening, reassuring him that the complaints would not be elevated to Peer Review, and stating that he and another Ascension Regional President, Steven Brockman-Webber, would come out to discuss his concerns about the Highland Lakes OR:

May 17, 2024 at 10:54 AM

> Thank you for your time last night and understand your frustration.
>
> Just to clarify, this value lines concern is not being elevated to peer review.
>
> Steven and I will come out early next week and meet with you and Denise.
>
> Please have a great and restful weekend

19

82.     On or about May 22, 2024, Highland Lakes CMO Walker, Administrator Karen Litterer, Clinic Director Watson, and President Brockman-Weber met with Dr. Hussaini as he had requested. At the start of the meeting, Dr. Hussaini asked CMO Walker to provide specific information about the complaints against him. CMO Walker responded with words to the effect that he did not have them but the complaints were the same he'd previously mentioned, about Dr. Hussaini being "nitpicky," going to the lead CST 2, and having issues with the assignment for the surgical schedule that day. Dr. Hussaini responded that he had met with OR Director Lemons, CST 2 and Administrator Litterer on April 29, 2024, and that all agreed that it was poor patient care, unprofessional and discourteous to assign CST 1 to the complex surgery under the circumstances without discussing it with Dr. Hussaini beforehand.

83.     Dr. Hussaini also told the Ascension leadership that he felt there was disparate treatment and/or discrimination and explained this would never happen to another surgeon at Highland Lakes. He stated that, for example, Dr. Thomas specifically has been angry about small issues, cursed, yelled at OR staff and yet has not had any write-ups or complaints. Dr. Hussaini reminded Administrator Littler that they had personally discussed Dr. Thomas getting into verbal fights with two OR nurse anesthetists in front of patients and nothing was ever done about it. In contrast, Dr. Hussaini stated that he felt he was constantly under a microscope. He stated he is open to constructive criticism but this did not feel like constructive criticism.

84.     In response, the Ascension leadership quickly deflected and dismissed Dr. Hussaini's concerns of discrimination and disparate treatment. As in CMO Walker's phone call with Dr. Hussaini a few days before, no one asked Dr. Hussaini any questions about his concerns of discrimination, such as asking for details about the behavior and different treatment of other surgeons, possible witnesses, additional evidence, or the full story.

20

85.     No one from Ascension Human Resources was present at the meeting, and no one from Human Resources or anyone else from Ascension management ever spoke with Dr. Hussaini about his discrimination complaints. Nor did Ascension ever advise or encourage Dr. Hussaini to speak with Human Resources.

86.     When Dr. Hussaini raised concerns of discrimination, the Ascension leadership stated that they wanted to focus on the OR operational issues. The meeting then turned to the continuing OR problems relating to the competence of staff, staffing turnover, and the lack of accountability for the staff and particularly for OR Director Lemons. The leadership reassured Dr. Hussaini that they would address the OR issues. CMO Walker stated he would personally come down to the OR and coordinate with Dr. Hussaini in advance regarding OR flow and operations.

87.     At no point in the meeting did anyone tell Dr. Hussaini that he had acted inappropriately in any manner at any time.

### After Receiving Dr. Hussaini's Discrimination Complaint, Ascension and CMO Walker Retaliate Against Him.

88.     Instead of investigating and taking Dr. Hussaini's complaint about discrimination seriously, Ascension and CMO Walker retaliated against him.

89.     Unbeknownst to Dr. Hussaini, on or about Wednesday, June 12, 2024, Ascension and CMO Walker held a meeting with all Ascension OR surgical staff members – except Dr. Hussaini – and intentionally kept the meeting a secret from him. In the secret group meeting, Ascension invited the OR staff to air any complaints they had about Dr. Hussaini.

90.     Group meetings, such as the one held by Ascension where staff complained about Dr. Hussaini, are not considered "best practices" when investigating personnel issues, are known to be problematic and the information obtained in such settings is frequently unreliable and incomplete.

91.    On information and belief, in the secret group meeting OR staff members made false, misleading and discriminatory allegations against Dr. Hussaini. Rather than investigate those allegations or allow Dr. Hussaini a chance to respond and address them, Ascension kept the allegations secret and never informed Dr. Hussaini of the meeting or any concerns.

92.    The following morning, on Thursday, June 13, 2024, CMO Walker texted Dr. Hussaini to tell him that he would be visiting the OR to watch the surgical processes:

Jun 13, 2024 at 7:28 AM

> Good morning.  Just letting you know I will be in the OR today to watch the processes from preop to postop... including timeout and surgical stop

93.    Dr. Hussaini was glad that CMO Walker would be present and believed the visit to the OR was to follow up on the patient care concerns Dr. Hussaini had raised. Instead, the apparent real purpose of the meeting was to scrutinize Dr. Hussaini following the secret meeting Ascension conducted the previous day and the false complaints of staff.

94.    While CMO Walker was present, Dr. Hussaini performed a complex hip replacement surgery. Ascension assigned CST 2 to assist him during the surgery.  Two product reps from the company Zimmer Biomet, which made the medical implants used in the surgery, Thad Varner and Connor Jacobs, were also present to assist.  A total of approximately nine people were present throughout the entire procedure.

95.    Before the day of the hip replacement surgery, Dr. Hussaini prepared a "template" or preoperative surgical plan for the surgery that was available through Ascension software and that the CSTs and medical product reps who were to assist in the surgery could review before the surgery. The template includes medical imagining and contains information on what is to be done

during the surgery, including what implants and/or instruments will be used in the surgery, so that the surgery team can have the correct parts available.

96.    In the preop surgical plan/template for the hip replacement surgery, Dr. Hussaini had specified that he would be using the smallest implant size available, which was a "size four," because the female patient receiving the hip replacement was a short person and had small bones.

97.    On the day of the surgery before it began, Dr. Hussaini asked CST 2 to place a medical device on the patient known as an "extension boot." An extension boot is a specialized component of orthopedic leg positioners for short stature patients that attaches to a patient's foot during a hip replacement surgery to allow the surgeon to precisely control the leg's position during the operation. The extension would have helped ensure a successful outcome with easier performance of her surgery.

98.    Additionally, to streamline the operating procedure and prevent complications during the surgery, before the surgery began and before the patient was on the operating table, Dr. Hussaini, as customary for him, reviewed with CST 2 and the product reps the pre-op plan for the surgery and specific implant size to be used.

99.    Because of the patient's short height, Dr. Hussaini explained what he had templated in advance, that they needed to use the smallest implant size available for the surgery, a size four. It was lead CST 2's job responsibility to prepare and ensure the correct implants and instruments were ready and available during the surgery. During this review, Dr. Hussaini checked with CST 2 to be certain he had pulled out the correct trial implants and instruments to be used. CST 2 confirmed that he did.

100.    Additionally, once the patient was on the operating table in the OR but before the surgery actually began, Dr. Hussaini conducted what is referred as a "time out" in which he goes

23

over with the operating team information about the patient and what will take place during the surgery. During this time out, Dr. Hussaini again called out that they would be using the smallest implant size available, a size 4, for the female patient. CST 2 again confirmed he had the correct implant.

101.    Despite Dr. Hussaini's planning and templating the surgery with CST 2, CST 2 made several errors during the operation that made the surgery more difficult and potentially put the patient's health at serious risk.

102.    First, CST 2 did not have the boot extension available during the surgery, despite Dr. Hussaini specifically asking him before the surgery to have the boot ready.

103.    Not having the boot extension ready as Dr. Hussaini had specifically asked made the hip replacement surgery more challenging and prolonged. However, delaying the surgery to locate and bring the extension to the OR and attach it to the patient would have taken additional time. The hip replacement surgery was being conducted under spinal anesthesia, which limited the time the operation could be safely performed. Under the circumstances, Dr. Hussaini felt he had to proceed with the operation without the surgical boot.

104.    Also during the operation, CST 2 provided Dr. Hussaini with a medical tool that is used to implant a "hip cup" in the patient's body as part of the hip replacement surgery. When CST 2 handed Dr. Hussaini the device, it was positioned backwards and with a screwdriver incorrectly left inside. Because of CST 2's error, Dr. Hussaini was unable to fit the cup in the patient's wound. As a result, the whole team had to pause the surgery to reorganize, understand, and correct CST 2's error.

105.    CST 2 had assisted Dr. Hussaini in hip replacement surgeries many times, had been trained by Dr. Hussaini for approximately over a decade, and clearly should have known that the

24

tool was incorrectly prepared and presented to Dr. Hussaini.

106.   When Dr. Hussaini told CST 2 that he had incorrectly positioned the tool and improperly left the screwdriver in the device, CST initially denied that he had done so. Dr. Hussaini then showed CST 2 and the reps the mistake. CST 2 apologized for the error but appeared flustered afterwards.

107.   In the next part of the surgery, CST 2 provided Dr. Hussaini with the *wrong size* medical implant that was to go into the patient's femur bone. Using the correct size of femoral implant is of paramount importance in a hip replacement surgery.

108.   Dr. Hussaini had told CST 2 multiple times that the team would be using the smallest possible size femur implant – a size four – and to prepare accordingly because of the patient's short stature and smaller bones. CST 2 repeatedly confirmed that he understood and that the correct implant would be ready in the surgery.

109.   During the surgery, Dr. Hussaini asked CST 2 for the femur implant. CST 2 then handed it to Dr. Hussaini. Dr. Hussaini was about to insert the implant into the patient's femur bone and hammer it into the bone, but noticed that the implant handed to him appeared too large. Dr. Hussaini then decided to inspect the implant which required disconnecting it from the tool used to hold and implant it.

110.   When he took off and inspected the femur implant CST 2 handed him, Dr. Hussaini discovered that CST 2 had given him the *wrong size* – a larger size six.  Dr. Hussaini showed the size six implant to CST 2 and told him that implant was not what he had asked for, and that the size four which had been templated before the surgery, barely fit the patient.  Dr. Hussaini told CST 2 words to the effect of, "What's going on? Get your head in the case. I don't want to fracture her femur or then we'll have a big problem. She's a very small size like we talked about before."

111.    CST 2 again appeared flustered and responded that he was sorry. CST 2 then gave Dr. Hussaini the correct size femur implant, Dr. Hussaini hammered the correct size femur implant into the female patient and successfully completed the operation.

112.    Dr. Hussaini maintained his calm throughout the surgery and managed the situation, including CST 2's errors. At no point did Dr. Hussaini threaten, yell, curse or make inappropriate statements to CST 2 or anyone else.

113.    Because of Dr. Hussaini's attention to detail and care for the patient's well-being, the hip replacement surgery was successful, in spite of CST 2's multiple errors.

114.    Unbeknownst to Dr. Hussaini, apparently shortly after the hip replacement surgery in which CST had made multiple errors, CST 2 complained that Dr. Hussaini allegedly "yelled" at him during the surgery. CST's claim was completely false.

115.    Unbeknownst to Dr. Hussaini, CMO Walker was made aware of CST 2's complaint about Dr. Hussaini. CMO Walker then apparently encouraged CST 2 to file a formal complaint against Dr. Hussaini with Ascension's Events Reporting System, which he did.

116.    Neither CMO Walker, CST 2, nor anyone else spoke with Dr. Hussaini after the surgery about CST 2's complaint or any concerns about Dr. Hussaini's conduct during the hip replacement surgery, or about the risks to patient safety caused by CST 2.

**Ascension Terminates Dr. Hussaini's Employment For False Reasons, With No Notice And No Opportunity To Respond To The Claims, And No Investigation of His Discrimination Complaints.**

117.    Unbeknownst to Dr. Hussaini, on Monday, June 17, 2024 – two business days after the hip replacement surgery on Thursday, June 13, 2024 – with no notice or discussion at all with Dr. Hussaini beforehand, CMO Walker went to the Board for Ascension (the "Board") about Dr. Hussaini. Based on testimony laid out by CMO Walker, the Board voted to terminate Dr.

Hussaini's nearly 16 years of employment "with cause."

118.    CMO Walker was fully aware of Dr. Hussaini's complaints of and opposition to discrimination, which Dr. Hussaini made to him less than a month before, on May 16 and 22, 2024. On both occasions, CMO Walker was dismissive and defensive in response to Dr. Hussaini's concerns of discrimination.

119.    Ascension did not tell Dr. Hussaini about the termination until Thursday, June 20, 2024. Ascension claimed reason for terminating his employment, that he had engaged in disruptive behavior, was blatantly false and pretextual.

120.    Before deciding to terminate Dr. Hussaini's more than 15 years of employment, the Ascension Board conducted no independent investigation regarding the allegations against him or his complaints of discrimination.

121.    No one from Ascension (including the Board or CMO Walker) spoke with Dr. Hussaini and gave him a chance to address the false allegations against him, including the false claims that Dr. Hussaini yelled at CST 2 during the hip replacement surgery just two business days before. No one asked Dr. Hussaini for his side of the story, allowed him to provide evidence or witnesses, or explain the circumstances including CST 2's serious errors during the hip replacement surgery.

122.    Similarly, no one from Ascension asked questions of Dr. Hussaini about his concerns of discrimination before Ascension decided to terminate his employment. In fact, unbeknownst to Dr. Hussaini, on Friday June 14, 2023, the day after the hip replacement surgery and the day before the Board voted to terminate his employment, Ascension closed the Value Lines discrimination complaint Dr. Hussaini had made approximately a month earlier. No one from Ascension ever reached out to Dr. Hussaini to speak with him about the discrimination complaint

27

as he had asked and had been told would happen. No one obtained further details, asked him for possible witnesses or allowed him to provide any evidence.  Despite this, Ascension stated in the notice of closure "We take all reported concerns seriously and we have conducted a thorough review. Upon completion of our review, we could not confirm that the allegation of Discrimination has occurred as you described."

123.    Ascension's decision to terminate Dr. Hussaini's employment, with no notice of wrongdoing or opportunity to respond, as well as no opportunity to address any behavior it may have deemed problematic was significantly different and worse than how it treated other physicians – physicians who had not complained of discrimination, who were not South Asian, Muslim, from Pakistan and who had a different race/national origin. These include but are not limited to Dr. Thomas, as discussed above.

124.    In terminating Dr. Hussaini's employment as it did, Ascension violated its own policies, procedures, normal practices and basic common courtesies that it afforded to other physicians.

125.    A*fter* Ascension made the decision to terminate Dr. Hussaini's employment, CMO Walker texted Dr. Hussaini at approximately 5:00 pm on June 17, 2024 and asked him to call. Dr. Hussaini called CMO Walker back as requested shortly afterwards.

126.    In the call CMO Walker did *not* inform Dr. Hussaini that his employment had been terminated earlier that afternoon, but instead for the first time informed Dr. Hussani that a complaint had been made against him by an OR staff member. CMO Walker would not provide Dr. Hussaini with any substantive information about the complaint but indicated it generally related to comments Dr. Hussani allegedly made to a staff member during the hip replacement surgery two business days before on Thursday, June 13, 2024.

127. CMO Walker told Dr. Hussaini that the complaint would be considered at a "Peer Review" meeting to be held three days later, on Thursday morning, June 20, 2024.

128. CMO Walker did not disclose to Dr. Hussaini that Ascension had already made the decision to terminate his employment.

129. Dr. Hussaini was shocked by the allegation and knew that he had not done anything inappropriate during the hip replacement surgery a few days before. To help him prepare for and respond to the allegation and the Peer Review meeting, after the call from CMO Walker he reached out to product rep Varner, who was present during surgery.

130. Dr. Hussaini asked Varner if he had noticed anything out of the ordinary during the surgery. Varner responded that he did not notice anything out of the ordinary, other than the surgery was challenging because of the patient's small size and that CST 2 made several mistakes during the surgery.

131. Dr. Hussaini asked Varner if he saw him lose his temper or get upset with the staff or anything like that. Varner said he saw nothing like that. Varner was physically the closest person to Dr. Hussaini and CST 2 during the surgery and would have been the most likely person to hear or observe any such conduct.

132. Dr. Hussaini asked Varner to provide a statement to the Peer Review committee about what he observed of Dr. Husaini's behavior and Varner agreed

133.  After the call from CMO Walker, Dr. Hussaini also texted an Ascension OR staff member Shey Gibbs, who assisted during the surgery and asked if she could talk for a moment. She replied "Sure. No Problem" and Dr. Hussaini called her.

134. During the brief call with Gibbs, Dr. Hussaini asked her if she remembered anything about the hip replacement surgery from Thursday, such as whether he was upset or got

irritated. Gibbs told Dr. Hussaini that she did not remember anything like that taking place.

135.    Dr. Hussaini explained words to the effect that he had been accused of making improper comments during that surgery by a staff member. He asked if she would be willing to come into work 30 minutes early on the day of the Peer Review meeting and serve as a witness and tell the committee what she had told him. Gibbs said she would.

136.    The following day, on June 18, 2024, Dr. Hussaini texted CMO Walker, President Weber-Brockman, and Medial Chief of Staff Erica Hughes, M.D. and asked for more details about the allegation to be heard in the Peer Review meeting.

137.    Dr. Hussaini had previously been a part of other Peer Reviews during his time with Ascension. He texted that in every Peer Review at Highland Lakes that he had sat on, every physician was provided with much more information about the complaint before the meeting and told exactly what they were appearing for so that they could review and be prepared in advance of the meeting. He asked to be given the same courtesy as others before the Peer Review meeting on Thursday.

138.    Initially, CMO Walker texted back that, "Medstaff office is working on redacting the names from the documents and will share when ready. Sorry for the delay."

139.    However, 30 minutes later, CMO Walker then texted back stating that the policy did not require Ascension to provide Dr. Hussaini with any information before the meeting and that he would be provided with no further information until the Peer Review committee meeting.

140.    Highland Lakes Medical Chief of Staff Dr. Hughes, who had also been with Ascension for many years and been part of numerous Peer Reviews responded by texting that this was not how other Peer Reviews had been handled and made it known she was not comfortable with treating Dr. Hussaini differently:

Dr. Erica Hughes Pulmonary SHL



We have never proceeded like this at SHL, and I am uncomfortable with this decision.

141. CMO Walker responded that this is "not a regular peer" review and no additional information would be provided.

142. On Thursday June 20, 2024, at approximately 7:30 a.m., Ascension conducted what CMO Walker described as the "not regular" Peer Review.

143. At the Peer Review meeting, Ascension for the first time provided Dr. Hussaini with more information about the specific allegation against him.

144. Dr. Hussaini responded to the committee with evidence that strongly refuted the false allegation.

145. After Dr. Hussaini spoke to the committee, he was forced to leave the room and the committee discussed the false allegation against him in secret.

146. After Dr. Hussaini left the Peer Review committee room, Ascension had told him to meet with Ascension Texas management employees Clay Carsner, COO, and Samson Jesudass, Chief Clinical Officer ("CCO") at 9:00 a.m. Dr. Hussaini presumed the meeting with leadership was to discuss the concerns he had raised regarding OR patient safety at Highland Lakes and/or to finally address his complaints of discrimination and disparate treatment.

147. CCO Jesudass began the meeting by telling Dr. Hussaini words to the effect that he had done an excellent job at Ascension and acknowledging how hard it has been for him to accomplish the things he'd accomplished. Jesudass told Dr. Hussaini words to the effect that he had played a critical role in both exceptional patient care and outcomes as well as year after year staff and Peer Reviews and patient surveys. Jesudass also told Dr. Hussaini that he was a leader

31

for Ascension's rural markets for orthopedic service lines and had greatly help expand orthopedic care in rural areas.

148. CCO Jesudass then said words to the effect of, "That is why it makes it so hard to tell you that we are terminating your contract effective immediately for conduct behavior issues."

149. Dr. Hussaini was completely shocked and devastated. He told CCO Carsner and CCO Jesudass that he had not been informed by anyone before today's Peer Review meeting about the allegations against him. He explained that had done everything possible to deliver excellent patient care despite a challenging and at times hostile work environment.

150. COO Jesudass told Dr. Hussaini words to the effect of "I'm sorry it happened this way, but I am just a messenger."

151. Dr. Hussaini left the meeting in shock, went to his office and cleared out some of his personal belongings.

152. Later that day after the termination meeting, Ascension emailed Dr. Hussaini a letter informing him of the results of the Peer Review meeting.

153. In Ascension's Position Statement to the EEOC responding to Dr. Hussaini's charge of discrimination and as part of its defense in this case, Ascension stated that its Peer Review committees are supposed to investigate allegations, establish a finding and assign a "severity level" of a violation based on the findings.

154. While Ascension and its Board decided to terminate Dr. Hussaini's employment immediately and "with cause" based on the false allegation against him, the results of Ascension's *own* Peer Review committee that heard and considered the allegation and the severity level assigned were not consistent with Ascension's decision to terminate Dr. Hussaini.

155. The conflicting findings are compelling evidence that Ascension's decision to

terminate Dr. Hussaini's employment is highly suspect and the reasons Ascension gave for the termination are merely an excuse, or "pretext," and that the real reason for the termination was illegal retaliation and discrimination.

156.    Texas law provides generally that information communicated to or from a peer review committee is generally confidential and privileged, except in civil rights cases. Other exceptions to confidentiality apply, including when the privilege has been waived. More evidence supporting Dr. Hussaini's claims of discrimination and retaliation will be provided to the Court and Jury about the peer review proceedings once the Court has established that such information may be disclosed.

157.    After Ascension terminated Dr. Hussaini's employment, Ascension received numerous complaints about his separation of employment and questions and concerns from many of his patients who wondered why Dr. Hussaini was suddenly gone without any explanation.

158.    By terminating Dr. Hussaini's employment, Ascension harmed his patients and the people in the rural areas he served by taking away an excellent, highly skilled and caring surgeon and health care provider.

159.    Ascension's termination of Dr. Hussaini's employment also effectively left his patients abandoned. Ascension had scheduled numerous patients for surgeries and care by Dr. Hussaini, including serious operations such as knee and hip replacements. Patients normally plan for these surgeries months and sometimes years in advance. Patients make plans to have family or friends care for them after the surgery, including having people come from other parts of the country to help with care.

160.    Within a few weeks after Ascension terminated Dr. Hussaini's employment, it hired a far less experienced, non-board-certified orthopedic surgeon to take his place. The replacement

surgeon hired by Ascension was white/Caucasian, not Muslim, and not originally from another country, unlike Dr. Hussaini.

**Ascension Provides False and/or Misleading Information To The EEOC**

161.    After Ascension terminated Dr. Hussaini's employment, Dr. Hussaini filed charges of discrimination with the EEOC, an agency of the United States government that investigates illegal discrimination and retaliation.

162.    In response to the Dr. Hussaini's charge of discrimination, Ascension provided the EEOC with false and/or misleading information.

163.    Providing false or misleading information to the United States government as part of an investigation is highly suspect and is further evidence that an employer is covering up for illegal discrimination or retaliation.

164.    For example, Ascension falsely and misleading suggested to the EEOC that Dr. Hussaini never filed a Value Lines discrimination complaint. He did.

165.    Ascension also told the EEOC that the initial complaint(s) against Dr. Hussaini in April 2024 was for yelling at CST 2 in front of a patient. In reality, CMO Walker told Dr. Hussaini as being that the complaint was Dr. Hussaini was "nitpicky" and that he spoke with CST 2 about the surgery schedule when that was not CST 2's job duty.

166.    Ascension also told the EEOC that it investigated and confirmed the complaint(s) in April 2024 and that it counseled him about it. In fact, CMO Walker told Dr. Hussaini to "not worry" about the complaint(s) and words to the effect that it was not a "big deal."

167.    Ascension also suggested to the EEOC that it called the meeting with Dr. Hussaini and hospital leadership on May 22, 2024, to counsel Dr. Hussaini and that morphed the conversation into airing his "frustrations." This is false and misleading. In fact, Dr. Hussaini called

34

the meeting to discuss his concerns about patient care and safety in the Highland Lakes OR and the disparate, discriminatory treatment he received.

**Ascension Continues To Retaliate And Discriminate
Against Dr. Hussaini After It Illegally Terminated His Employment**

168. After Ascension terminated Dr. Hussaini's employment, Ascension further retaliated and discriminated against Dr. Hussaini.

169. Ascension made false and defamatory statements about Dr. Hussaini to potential employers that have prevented him from obtaining comparable employment as an orthopedic surgeon in the central Texas area, the community in which he has worked and lived for almost sixteen years.

170. For example, on the afternoon of July 28, 2024, Dr. Hussaini had a phone conversation with Dr. Matthew Driscoll, a long-time professional acquaintance and Chief of Orthopedics at Austin Regional Clinic ("ARC").

171. ARC is the largest multi-specialty medical group in Greater Austin.

172. Dr. Driscoll contacted Dr. Hussaini about a potential job opening.

173. Given Dr. Hussaini's extensive orthopedic experience and success, Dr. Driscoll described Dr. Hussaini as a "perfect fit" for the job.

174. Dr. Hussaini was very excited about the job prospect, which would have allowed him to continue delivering orthopedic care locally without uprooting his young child, elderly parents, and wife from their community.

175. Despite praising Dr. Hussaini, Dr. Driscoll expressed hesitation about Dr. Hussaini's candidacy for the role based on what ARC higher-ups had heard about his departure from Ascension.

176. Dr. Driscoll told Dr. Hussaini that someone in Ascension management told ARC's

CEO negative information about Dr. Hussaini.

177. ARC ultimately rejected Dr. Hussaini for the position.

178. Ascension also illegally retaliated and discriminated against Dr. Hussaini by enforcing or threatening to enforce a "non-compete" provision against him.

179. Dr. Hussaini's Employment Agreement with Defendants included a non-compete provision that purports to keep Dr. Hussaini from practicing for two years after his termination within a 30 or 50-mile radius of Ascension Seton's location or Highland Lakes.

180. Dr. Hussaini worked in the Austin and central Texas area for approximately 16 years. He lives here with his wife, young child, and elderly parents. His brother and his family also reside in Austin. He is deeply rooted in the local community as a physician who cared for those in need.

181. The non-compete provision makes it essentially impossible for Dr. Hussaini to find a comparable position for at least two years after his termination in the community in which he lives and has worked.

182. Ascension has not enforced non-compete provisions against other departing physicians who did not oppose or complain of discrimination or who are not South Asian, Muslim, or born in another country (Pakistan) like Dr. Hussani.

**Ascension's Illegal Actions Have Caused Real and Serious Damage to Dr. Hussaini**

183. Ascension's illegal actions, including the termination of Dr. Hussaini's employment and its treatment of him after the termination, have devastated Dr. Hussaini personally, professionally and economically.

184. As a result of Ascension's illegal conduct, Dr. Hussaini has suffered significant economic damages.

185. When Dr. Hussaini worked at Ascension, he was a confident, capable, and happy

man eager to contribute his talents and skills in an underserved rural community. Over nearly sixteen years, he worked hard, long hours for Ascension, commuting over 100 miles daily to teach, care, and help others.

186.     Ascension's illegal discriminatory and retaliatory conduct has harmed Dr. Hussaini's reputation in the community and caused real emotional pain to Dr. Hussaini, including loss of confidence, loss of self-esteem, feelings of failure, betrayal, disappointment, sadness, stress, anxiety, difficulty sleeping, loss of appetite, and avoidance of friends, relatives and professional associates.

## CAUSES OF ACTION

## COUNT ONE

### VIOLATION OF THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981
### DISCRIMINATION BASED ON RACE AND ETHNIC ANCESTRY

187.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

188.     Defendants denied Plaintiff the same right to make and enforce contracts as enjoyed by people who are white/Caucasian, non-South Asian or non-Pakistani physicians, including rights involving the making, performance, modification, and termination of contracts with Defendants, as well as the  enjoyment of all benefits, terms, and conditions of that relationship, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

189.     Defendants discriminated against Plaintiff because of his race, including by (i) wrongfully terminating his employment; (ii) defaming him; and (iii) enforcing a non-compete provision against him that Defendants did not enforce against similarly situated physicians who, unlike Plaintiff, were Caucasian, not South Asian and/or not Pakistani.

## COUNT TWO

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. § 2000e-2(a)(1)
### DISCRIMINATION BASED ON
### RACE, COLOR, RELIGION, AND NATIONAL ORIGIN

190.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

191.    At all relevant times, Defendants were Plaintiff's employers within the meaning of Title VII of the Civil Rights Act of 1964.

192.    Defendants violated Title VII by discriminating against Plaintiff based on his race, color, religion, and national origin, including by (i) wrongfully terminating his employment; (ii) defaming him; and (iii) enforcing a non-compete provision against him that Defendants did not enforce against similarly situated physicians who, unlike Plaintiff, were Caucasian, not South Asian, not Muslim, and/or not Pakistani.

### COUNT THREE
### VIOLATION OF CHAPTER 21, TEXAS LABOR CODE
### DISCRIMINATION BASED ON
### RACE, COLOR, RELIGION, AND NATIONAL ORIGIN

193.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

194.    At all relevant times, Defendants were Plaintiff's employers within the meaning of Chapter 21 of the Texas Labor Code.

195.    Defendants violated Chapter 21, including but not limited to Tex. Labor Code §21.051, by discriminating against Plaintiff based on his race, color, religion, and national origin, including by (i) wrongfully terminating his employment; (ii) defaming him; and (iii) enforcing a non-compete provision against him that Defendants did not enforce against similarly situated

38

physicians who, unlike Plaintiff, were Caucasian, not South Asian, not Muslim, and/or not Pakistani.

## COUNT FOUR
### VIOLATION OF SECTION 1981 OF THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981
### RETALIATION FOR OPPOSING
### RACE AND ETHNIC ANCESTRY DISCRIMINATION

196.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

197.    Defendants retaliated against Plaintiff because he engaged in protected activity by opposed and/or complained about discrimination based on his South Asian race and Pakistani ethnic ancestry.

198.    Defendants knew or should have known of the discrimination.

199.    Defendants' actions, through their employees, as more particularly alleged above, violated Plaintiff's rights against retaliation, proscribed by 42 U.S.C. § 1981, for opposing what he reasonably believed to be discrimination based on race and ethnic ancestry.

200.    Defendants subjected Plaintiff to adverse actions by (i) wrongfully terminating his employment; (ii) disparaging or defaming him; and (iii) enforcing a non-compete provision against him that Defendants did not enforce against similarly situated physicians who, unlike Plaintiff, did not complain about discrimination based on race and/or ethnic ancestry.

## COUNT FIVE
### VIOLATION OF SECTION 1981 OF THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981
### RETALIATION FOR OPPOSING DISCRIMINATION

201. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

202. At all relevant times, Defendants were Plaintiff's employers within the meaning of Title VII of the Civil Rights Act of 1964.

203. Plaintiff engaged in protected activity that included, but is not limited to, opposing or complaining to Defendants about conduct that he reasonably believed constituted discrimination based on race, color, religion, and national origin.

204. Defendants violated Title VII by retaliating against Plaintiff for his protected activity, including by (i) wrongfully terminating his employment; (ii) defaming him; and (iii) enforcing a non-compete provision against him that Defendants did not enforce against similarly situated physicians who, unlike Plaintiff, never complained of discrimination based on race, color, religion, and/or national origin.

205. A reasonable person would find Defendants' retaliatory acts materially adverse and such acts would dissuade a reasonable person from complaining about or opposing discrimination.

206. Because of the continuous nature of Defendants' retaliatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

### COUNT SIX
### VIOLATION OF CHAPTER 21, TEXAS LABOR CODE
### RETALIATION FOR OPPOSING DISCRIMINATION

207. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

208. At all relevant times, Defendants were Plaintiff's employers within the meaning of Chapter 21 of the Texas Labor Code.

40

209.    Plaintiff engaged in protected activity that included, but is not limited to, opposing or complaining to Defendants about conduct that he reasonably believed constituted discrimination based on race, color, religion, and national origin.

210.    Defendants violated Chapter 21, including but not limited to Tex. Labor Code §21.055 by retaliating against Plaintiff for his protected activity, including by (i) wrongfully terminating his employment; (ii) defaming him; and (iii) enforcing a non-compete provision against him that Defendants did not enforce against similarly situated physicians who, unlike Plaintiff, never complained of discrimination based on race, color, religion, and/or national origin.

211.    A reasonable person would find Defendants' retaliatory acts materially adverse and such acts would dissuade a reasonable person from complaining about or opposing discrimination.

212.    Because of the continuous nature of Defendants' retaliatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein

## COUNT SEVEN
## BREACH OF CONTRACT

213.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

214.    Plaintiff and Defendants entered into a valid and legally enforceable Employment Agreement.

215.    Section 7.1 of the Employment Agreement entered into between Dr. Hussaini and Defendants specifies that the Agreement was effective as of April 1, 2010 for an initial term of three years.

216.    Per Section 7.2, the Agreement automatically renews "for successive one (1) year terms unless otherwise terminated."

41

217.    At the time Defendants fired Dr. Hussaini, the Employment Agreement had not been terminated and therefore remained in effect.

218.    Ascension's termination of Dr. Hussaini breached and violated the Employment Agreement.

219.    To justify terminating Dr. Hussaini, Ascension falsely claimed that he had engaged in disruptive behavior of allegedly threatening, yelling and cursing at OR staff and that, because of this behavior, Ascension terminated Dr. Hussaini "for cause" pursuant to Section 7.4(f)(iii) and Section 2.11 of the Agreement.

220.    Section 7.4(f)(iii) of the Agreement provides that Ascension may terminate Dr. Hussaini "for cause" if he conducts himself "in any unprofessional and unethical manner." Section 2.11 of the Agreement permits Ascension to terminate Dr. Hussaini "for cause" if he violates Ascension's Policies and Procedures, including Ascension Seton's Code of Conduct.

221.    Dr. Hussaini did not engage in the conduct as Ascension falsely alleged.

222.    Ascension failed to speak with Dr. Hussaini to allow him to respond to the false allegations, provide further information, consult with these witnesses, or consider the witnesses' written statements before making the decision to terminate his employment.

223.    After the decision to terminate was made but before the termination was actually carried out and/or told to Dr. Hussaini, Dr. Hussaini refuted the false claims against him and alerted Defendants to eye witnesses who submitted written statements that refuted the false allegations against him, and who also would make themselves available to provide further information regarding his behavior during the April 25, 2024 and June 13, 2024 surgeries. In spite of this information, Ascension proceeded to terminate Dr. Hussaini.

224.    Ascension knew or should have known that Dr. Hussaini (i) did not engage in unprofessional, unethical, or disruptive behavior; (ii) did not threaten, yell or curse at OR staff; and (iii) did not violate Ascension policies, rules, or standards related to physician conduct or behavior.

225.    As a result of Ascension wrongfully terminating Dr. Hussaini's employment "for cause," Dr. Hussaini incurred substantial damages.

226.    Further, Section 7.4 of the Agreement specifies that Ascension "shall" furnish Dr. Hussaini written notice of his alleged failure to abide by the Agreement or his breach of the Agreement, if the basis for Ascension's action is one capable of being "cured" by Dr. Hussaini.

227.    Even assuming that Ascension believed that Dr. Hussaini engaged in the misconduct of which it accused him, Defendants failed to provide Dr. Hussaini the chance to "cure" and inappropriate behavior as required by Section 7.4 of the Agreement.

228.    Defendants breached the agreement by failing to provide Dr. Hussaini thirty (30) calendar days to "cure" his alleged breach of the Employment Agreement.

229.    If Defendants had provided notice to "cure" as required by the Employment Agreement, Dr. Hussaini would have "cured" any perceived violations and his employment would not have been terminated.

230.    Plaintiff performed or tendered performance of the Employment Agreement in full satisfaction of all obligations in the Employment Agreement that applied to him.

231.    Defendants breached the Employment Agreement by terminating Plaintiff's employment "for cause" where the conditions justifying a "for cause" termination under the Employment Agreement were not present and where Defendants knew or should have known that the conditions justifying a "for cause" termination under the Employment Agreement were not

43

present.

232.    Section 4.1 of the Agreement provides for a covenant not to compete, for two years after termination, within "a fifty (30) [sic] mile radius of employer's location or Seton Highland Lakes Hospital & Health Centers in Burnet County, Texas."[1]

233.    The non-compete provision all but guarantees that Plaintiff will not be able to find a comparable position for at least two years following his termination from Ascension.

234.    Plaintiff is licensed as a physician by the Texas Medical Board.

235.    The Employment Agreement does not permit the physician to buy out of the non-compete provision at a reasonable price or to obtain other relief from the provision.

236.    The non-compete provision does not permit the physician to provide continuing care and treatment to a specific patient or patients during the course of an acute illness if providing the continuing care or treatment takes place outside the non-compete provision's temporal and geographic limits.

237.    The non-compete provision is unreasonable because the limiting effect it has extends further than necessary to protect a legitimate business interest of Defendants.

238.    Because this non-compete provision is not reasonable in time, geographic scope, or activities to be restrained, it is unenforceable under Texas Business and Commerce Code §§ 15.50 and 15.51(b).

239.    Following Plaintiff's termination, Defendants confirmed that Ascension would enforce the non-compete provision against Plaintiff, even though Defendants have declined to enforce non-compete provisions against similarly situated (i) non-South Asian, non-Muslim,

---

[1] The non-compete provision in the Agreement includes the number "30" in parentheses after the word "fifty." Plaintiff believes this discrepancy reflects a typographical error and that Ascension intended the number in parentheses to be "50."

and/or non-Pakistani physicians, and/or (ii) physicians who never engaged in protected activity.

240.   After two years without practicing medicine and/or surgery, a physician's and/or surgeon's skills will deteriorate and he will be less employable for the rest of his life.

241.   It is fundamentally unjust and inequitable to allow Defendants, after unlawfully terminating Plaintiff for discriminatory, retaliatory, and otherwise unlawful reasons, to prevent him from working in his profession on a potentially indefinite basis.

242.   By restricting Plaintiff's ability to treat and care for patients, the non-compete provision also jeopardizes patient care and infringes on patient choice.

243.   Pursuant to Fed. R. Civ. P. 57, 28 U.S.C. §§ 2201–2202, and the Texas Business and Commerce Code, Plaintiff seeks (i) a declaration that the terms of the non-compete provision as described in Section 4.1 of the Employment Agreement are unreasonable and unenforceable because the provision lacks the mandatory requirements for a non-compete to be enforceable against a person licensed as a physician by the Texas Medical Board; and (ii) all other relief, whether monetary or injunctive, allowable under law.

## DAMAGES

244.   Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

245.   As a result of Defendants' violations of law, Dr. Hussaini has suffered actual damages in the form of lost compensation, wages, benefits and other economic damages (past and future).  Dr. Hussaini has also suffered compensatory damages, including real emotional pain and suffering, damage to reputation, loss of enjoyment of life, mental anguish, damage to reputation and other losses.  As a result of Defendants' violations of law, Dr. Hussaini requests that the Court enter an order for all actual, economic, compensatory, liquidated, and other damages or remedies,

equitable, statutory or otherwise, and attorney fees, expert fees, expenses and costs.

246.    Defendants' actions were committed intentionally and willfully, with malice and/or reckless indifference to the statutorily protected rights of Plaintiff. As such, Defendants should be required to pay punitive and/or exemplary damages.

**PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Dr. Hussaini respectfully prays that Defendants be cited and called to answer, and that on final judgment Dr. Hussaini be granted relief under federal law, including:

a)    Damages for lost wages and benefits, past and future;

b)    Compensatory damages;

c)    Punitive damages;

d)    Damages for damage to reputation, emotional distress and mental anguish, past and future;

e)    Equitable remedies, including reinstatement as feasible;

f)    Attorney fees, expert fees, expenses and costs of suit;

g)    Interest allowed by law;

h)    General damages;

i)    Special damages;

k)    Injunctive and/or equitable relief to prevent Defendants from illegally discriminating or retaliating against other employees;

l)    A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, and Texas Business and Commerce Code §§ 15.50

and 15.51(b);

m)    A declaratory judgment that the practices complained of herein are unlawful and constitute breach of contract;

n)    A declaratory judgment that Section 4.1 of the Employment Agreement (the non-compete provision) entered into between Plaintiff and Defendants is unenforceable; and

o)    Other and further relief as the Court may deem just and proper.

Respectfully submitted,

**Robert W. Schmidt Law Firm, PLLC**

*/s/ Robert W. Schmidt*
Robert W. Schmidt
State Bar No. 17775429
bob@robertwschmidt.com
1502 West Avenue
Austin, Texas 78701
Telephone:  (512) 484-2276
Facsimile:  (512) 537-0708

**Hutchison & Foreman, PLLC**
Susan E. Hutchison
Texas Bar No. 10354100
sehservice@FightsforRight.com
500 East 4th St., Ste. 100
Fort Worth, Texas 76102
T: (817) 336-5533
F: (817) 887.5471

**ATTORNEYS FOR PLAINTIFF**